**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CLARK ELMORE,
            *Petitioner-Appellant*,

            v.

STEPHEN SINCLAIR,
            *Respondent-Appellee*.

No. 12-99003

D.C. No.
2:08-cv-0053-RBL

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Ronald B. Leighton, District Judge, Presiding

Argued and Submitted
November 20, 2014—Portland, Oregon

Filed April 1, 2015
Amended September 3, 2015

Before: Richard R. Clifton, Milan D. Smith, Jr.,
and Andrew D. Hurwitz, Circuit Judges.

Order;
Opinion by Judge Milan D. Smith, Jr.;
Concurrence by Judge Hurwitz

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel denied a petition for panel rehearing, denied on behalf of the court a petition for rehearing en banc, and replaced an April 1, 2015, opinion and concurring opinion with an amended opinion and concurring opinion, in a case in which the panel affirmed the district court's denial of Clark Elmore's habeas corpus petition challenging his conviction and death sentence for the rape and murder of his stepdaughter.

The panel held that the Washington Supreme Court did not act unreasonably in rejecting Elmore's claim that his shackling on the first day of voir dire for the sentencing trial deprived him of due process. The panel held that assuming, *arguendo*, that Elmore can show a violation of due process, he cannot show prejudice because of the limited duration of his shackling and the violent nature of his crime.

The panel held that the Washington Supreme Court likewise reasonably rejected, for failure to show prejudice, Elmore's ineffective assistance of counsel claim based on counsel's failure to object to the shackling.

The panel held that it was not unreasonable for the Washington Supreme Court to reject Elmore's claim that counsel was ineffective for proceeding with a remorse-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

oriented strategy to the exclusion of mental-health and brain-damage defenses.

The panel held that it was not unreasonable for the Washington Supreme Court to reject Elmore's claim that counsel was ineffective for not objecting to the redaction of his taped confession, which removed material in which Elmore had expressed regret about his relationship with the victim.

The panel held that assuming, *arguendo*, that counsel performed deficiently by advising Elmore to plead guilty, he cannot show that this advice prejudiced him. The panel wrote that although Elmore submitted an affidavit to the effect that but for counsel's errors he would not have pleaded guilty, the record demonstrates otherwise. The panel wrote that given the evidence against him, including a damning tape-recording confession, it is highly likely that a jury would have still convicted him of the same crime, even if he had not pleaded guilty.

The panel held that the Washington Supreme Court was not unreasonable in rejecting Elmore's claims that he was deprived of his right to trial by an impartial jury because a juror lied during voir dire when he stated that he had not been the victim of sexual abuse. The panel wrote that the juror likely could not have been removed for cause, and that the juror's statements suggest that he believed his responses on the questionnaire to be accurate.

Concurring in part and concurring in the result, Judge Hurwitz wrote that he doubts that Elmore received competent representation. But applying the forgiving AEDPA standard under which this court cannot afford relief if fairminded

jurists could disagree on the correctness of the state court's decision, he concurred in the panel opinion insofar as it concludes that the Washington Supreme Court did not unreasonably determine that Elmore failed to establish constitutional prejudice from either the guilty plea or the shackling. He also wrote that although defense counsel plainly fell below the applicable standard of care in not investigating Elmore's brain damage, he could not conclude that the state court unreasonably determined that there is no reasonable probability that a proper investigation would have changed the outcome.

## COUNSEL

Robert Harris Gombiner (argued), Law Offices of Robert Gombiner, Seattle, Washington; Jeffrey E. Ellis, Law Office of Alsept & Ellis, Portland, Oregon, for Petitioner-Appellant.

John J. Sampson (argued) and Robert W. Ferguson, Washington Attorney General's Office, Olympia, Washington, for Respondent-Appellee.

## ORDER

The panel has voted to deny Appellant's petition for panel rehearing and the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc, and no judge of the court has requested a vote on en banc rehearing. *See* Fed. R. App. P. 35(f).

The petition for panel rehearing and the petition for rehearing en banc are denied.

The opinion and concurring opinion filed on April 1, 2015 are hereby amended, and replaced by the amended opinion and amended concurring opinion filed concurrently with this order. No further petitions for panel rehearing or petitions for rehearing en banc will be entertained in this case.

## OPINION

M. SMITH, Circuit Judge:

Clark Elmore was convicted and sentenced to death for the rape and murder of his stepdaughter, Kristy Ohnstad, in 1995. In this appeal of a judgment of the federal district court, Elmore challenges his death sentence on various constitutional and procedural grounds. Specifically, Elmore argues that he was deprived of due process, the effective assistance of counsel, and the right to an impartial jury during the sentencing phase of his capital trial.

Elmore fully litigated these claims through the Washington state court system. The Washington Supreme Court first considered and dismissed several of these issues on direct appeal. Elmore subsequently filed a collateral petition, which the Washington Supreme Court remanded to the trial court for a hearing on Elmore's defense counsel's failure to present a mental health defense. After this evidentiary hearing, the Washington Supreme Court dismissed Elmore's personal restraint petition and held that counsel was not ineffective for not having presented a mental health defense.

Elmore subsequently filed this federal habeas petition in federal court. We hold that the conclusion of the Washington Supreme Court that Elmore was not deprived of his constitutional rights during his capital trial was not unreasonable. We therefore affirm the decision of the district court to uphold Elmore's death sentence.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. The Crime

On April 17, 1995, Clark Elmore raped and murdered his stepdaughter, Kristy Ohnstad, in Whatcom County, Washington. The details of the crime are gruesome, and not in dispute. After having a verbal altercation with Kristy Ohnstad in which she accused Elmore of having sexually abused her as a child, Elmore told her he was going to drive her to school. Elmore, instead, drove the victim to a secluded area, parked on an undeveloped dirt roadway, and forced her to have intercourse with him. He then choked Kristy Ohnstad with his hands until she became unconscious.

After she was unconscious, Elmore removed her belt, placed it around her neck, and buckled it. He then removed a needle-like tool from his toolbox, forced it into her left ear, and pushed it through to the opposite side of her skull. Elmore then placed a plastic garbage bag around her head and struck her repeatedly with a hammer. Once he was convinced she was dead, Elmore disposed of her body in the woods.

When Kristy Ohnstad's mother initially reported her missing, Elmore posed as a concerned father searching for his daughter. He called the media and claimed that the police were not doing enough to search for her. Once the police

began to focus their search for Kristy Ohnstad on the area where Elmore had concealed the body, Elmore fled to Oregon. Elmore, however, returned to Washington soon after fleeing, and surrendered to the police. After his arrest, Elmore gave a tape recorded confession in which he recounted the details of his crime.

## B.  Elmore's Guilty Plea

Elmore was charged with aggravated first degree murder, which made him eligible for the death penalty. At his first court appearance, Elmore stated that he did not want an attorney, and attempted to plead guilty. The trial court declined to take the plea and appointed Jon Komorowski as defense counsel. This was Komorowski's first capital case. After being appointed, Komorowski put together a team of co-counsel, an investigator, a mental health advisor, and a legal assistant.

After having discussions with Komorowski, Elmore pleaded guilty at his second court appearance. Komorowski stated on the record that he was satisfied that Elmore was mentally competent to plead guilty and that his client was pleading guilty voluntarily. During his colloquy, Elmore stated to the judge that he was competent to plead guilty and that he was fully aware of the rights he was waiving, including the right to a trial by jury, by entering the guilty plea.

## C.  Sentencing Trial

Although Elmore did not receive promises of a life sentence in exchange for his guilty plea, Komorowski's strategy at sentencing apparently was to present the jury with

evidence of Elmore's remorse for the crime, which included the plea itself. Komorowski arrived at this strategy after working with two focus groups of mock jurors, and conducting a mock sentencing trial. Questioning of the focus groups of mock jurors made clear that the most important mitigating factor for a jury at sentencing would be Elmore's remorse and acceptance of personal responsibility. The focus groups also expressed concern about abusive conduct by Elmore, including past acts of sexual abuse and violence.

As part of his preparation for the sentencing trial, Komorowski considered presenting Elmore's mental health issues as a mitigating factor. The defense team investigated Elmore's background and retained a clinical psychologist, Dr. Ronald Kleinknecht, to determine whether Elmore had a mental illness. Dr. Kleinknecht observed that Elmore did not suffer a serious impairment in cognitive skills. Since Elmore worked as a mechanic, Dr. Kleinknecht concluded that Elmore had been able to engage in some complex and logical thinking as part of his occupation.

Dr. Kleinknecht referred Elmore to Dr. Donald Roesch, a clinical psychologist with a specialty in psychopathy. After meeting and analyzing Elmore, Dr. Roesch concluded that Elmore was not a psychopath. Dr. Roesch suggested that Elmore's murder of Kristy Ohnstad was impulsive, and consistent with heightened emotional arousal. While some of the capital defense attorneys who worked with Komorowski recommended further mental health investigation, Komorowski was concerned about Dr. Roesch's findings, including Elmore's heightened emotional arousal at the time of the crime. Dr. Roesch also had suggested that Elmore appreciated the seriousness of his crime and attempted to

cover it up. Komorowski did not further investigate these matters.

As the sentencing trial approached, Elmore suggested that he was less inclined to suffer feelings of remorse. Elmore had received a letter from Sue Ohnstad indicating that she would not be able to forgive Elmore for the murder of her daughter, and that she would have no further contact with him. In response to this letter, Elmore told his defense team's investigator that he no longer had anyone to whom he thought he needed to apologize. As a result, Komorowski testified that he believed that "time was running out" on the defense's ability to pursue a remorse defense.

The defense team ultimately did not present mental health or brain damage evidence. Instead, they presented evidence of Elmore's acceptance of personal responsibility for his crime. As part of this defense strategy, Elmore agreed to appear in jail garb throughout the sentencing trial. Elmore also appeared in shackles on the first day of jury selection. Although this was not part of the defense team's strategy, Komorowski did not object to the use of shackles. After the prosecutor raised concerns about Elmore appearing in shackles, Elmore did not appear shackled after the first day of voir dire.

The prosecutor's case focused on Elmore's confession. A detective played a redacted version of Elmore's taped confession. The redacted tape omitted a portion of the confession that Komorowski believed showed Elmore's remorse, including statements about Elmore's relationship with Kristy Ohnstad and his regret for not having developed a father-daughter relationship with her. To correct this error,

Komorowski decided to have the investigating detective read that portion of the tape into the record on cross-examination.

The defense's case attempted to show Elmore's remorse and acceptance of responsibility for the crime. Three judges, who had overseen various phases of Elmore's charging and sentencing, testified about pretrial proceedings and Elmore's willingness to accept responsibility. The investigator on Komorowski's team testified regarding Elmore's remorse. The defense also presented evidence about Elmore's military service in Vietnam, his work history, and his relationship with Sue Ohnstad.

At the end of the sentencing trial, the judge instructed the jury, "Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?" During deliberations, the jury had access to portions of Elmore's tape-recorded confession. The jury unanimously concluded that Elmore did not merit leniency, and the judge sentenced Elmore to death.

After the sentence was handed down, Elmore moved for a new trial, arguing that the jury had improperly listened to the redacted tape confession during deliberations. The judge denied the motion, ruling that the jury properly considered the tape during deliberations.

### D.  Juror 12

Juror 12 stated during a post-trial interview that he had experienced two incidents of sexual molestation. In the first incident, the juror had been "spooned" by another boy when he was around eight years old. In the second incident, when

Juror 12 was around eleven years old, a boy in his boy scout troop had groped him.

During voir dire for the penalty phase of Elmore's trial, Juror 12 stated on a questionnaire that he had never been the victim of a crime or a sexual offense. The juror testified in his post-trial interview that he did not believe that the two past incidents of sexual abuse were crimes or sexual offenses. Juror 12 also testified that he did not think about these two acts of sexual molestation during Elmore's trial and the subsequent deliberations.

### E.  Direct Appeal to Washington Supreme Court

Elmore appealed his death sentence to the Washington Supreme Court. Elmore raised various procedural challenges, including due process challenges to his shackling during the first day of jury selection and the jury's access to his taped confession during deliberations. Elmore also claimed that Komorowski had not advised him of the constitutional rights he would forfeit as a result of the guilty plea.

The Washington Supreme Court affirmed the conviction and sentence on direct appeal. The Court suggested that although it may have been error for Elmore to be shackled on the first day of voir dire, because the trial court did not order Elmore shackled during sentencing, this did not constitute a due process violation. *State v. Elmore*, 139 Wash. 2d 250, 275 (1999). Even if he had suffered a due process violation, the Court held that Elmore could not show prejudice.

### F. Elmore's Personal Restraint Petition and Evidentiary Hearing

After the Washington Supreme Court affirmed the death sentence on direct appeal, Elmore filed a personal restraint petition in Washington state court. This collateral petition alleged several constitutional deficiencies in the sentencing phase of the trial, including that Elmore had been denied the right to an impartial jury and that counsel was ineffective for allowing Elmore to appear in restraints on the first day of voir dire. Elmore also alleged that counsel had been ineffective by not presenting evidence of remorse or Elmore's diminished mental capacity. *In re Elmore*, 172 P.3d 335, 339 (Wash. 2007).

The Washington Supreme Court remanded the case to the superior court for an evidentiary hearing concerning the defense's failure to present mental health evidence. During this hearing, Komorowski testified at length about his defense strategy and his reasons for pursuing a defense based solely on Elmore's remorse for his crime. Komorowski stated that he was concerned about dueling mental health experts, the ability of the prosecutor to present evidence of Elmore's past acts of sexual abuse as rebuttal evidence, and Elmore retracting his feelings of remorse.

Several mental health experts testified at this hearing on the issue of Elmore's alleged mental health issues. The experts testified about whether these impairments could have prevented Elmore from comprehending the crime he had committed. Dr. Dale Watson, one of Elmore's experts, stated that Elmore had committed the crime under an extreme emotional disturbance and had a reduced ability to control himself. Dr. George Woods, another one of Elmore's experts,

testified that Elmore likely suffered an extreme emotional disturbance and that this might have impaired his ability to comply with the law. Dr. Henry Levine, a prosecution expert, testified that while Elmore might suffer from psychiatric disorders, the evidence at the time of the crime revealed that "[Elmore] was calm, calculating, able to conform his conduct with the requirements of the law and that he took rather significant measures prior to the crime and during the crime to cover it up, which indicates to me he was thinking and behaving in terms that allowed him to be described as a thinking and calculating individual."

After the Washington Supreme Court reviewed the superior court's findings of fact, in November 2007, it denied Elmore's personal restraint petition. The Court held that: (1) it was not deficient representation for the defense not to present a mental health defense, and instead rely on remorse, (2) it was deficient representation to allow Elmore to appear in restraints on the first day of the penalty phase of the trial, but this deficiency did not prejudice Elmore, (3) claims concerning the jury's consideration of the taped confession during deliberations had been considered and rejected on direct appeal, and (4) Elmore was not denied an impartial jury because Juror 12's incidents were "minor" and "[m]inimal sexual contact between two young boys is significantly different from the rape and murder charges Elmore faced." *In re Elmore*, 172 P.3d at 352.

### G.     Federal Habeas Petition

Elmore filed a federal petition for a writ of habeas corpus under 28 U.S.C. § 2254, listing thirteen purported errors by the Washington state courts. Among these claims were that his appearance in restraints violated due process, that his

counsel provided ineffective representation, and that he was denied an impartial jury because a juror misled the court by stating that he had not been sexually abused.

The district court denied Elmore habeas relief. On the ineffective assistance of counsel claims, the district court noted that "counsel's advice to plead guilty was the product of reasonable strategy—his client wanted to plead guilty, the prosecutor refused to negotiate, and any attempt at proving innocence would have been futile and would have possibly detracted from Mr. Elmore's claims of taking responsibility and feeling remorse." The court held that Komorowski selected a reasonable defense strategy of presenting mitigation evidence, and not presenting a mental health defense. On the impartial jury claim, the district court held that Juror 12's answers to the questionnaire were not inconsistent, that the Washington Supreme Court did not unreasonably dismiss this challenge, and that Elmore had not shown prejudice. On the claims related to Elmore's shackling on the first day of the sentencing trial, the court found that Elmore had not objected to being shackled and that this could have constituted a strategy to show Elmore's remorse and acceptance of responsibility. Elmore subsequently filed this appeal.

## JURISDICTION AND STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, 131 S. Ct. 770, 783 (2011). Under AEDPA, we determine whether the Washington Supreme Court's resolution of Elmore's constitutional claims was

unreasonable. *Harrington*, 131 S. Ct. at 785. Specifically, under 28 U.S.C. § 2254(d)(1), we consider whether the "state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to [that of the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). The "unreasonable application clause" of 28 U.S.C. § 2254(d)(1) requires that we consider whether the state court unreasonably applied the holdings of the Supreme Court to the facts of Elmore's case. *Holland v. Jackson*, 542 U.S. 649, 652 (2004) (per curiam). Under 28 U.S.C. § 2254(d)(2), we determine whether the state court adjudication "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

## DISCUSSION

### I.  Due Process Claim Related to Elmore's Appearance in Restraints

Elmore contends that his shackling on the first day of jury selection deprived him of the constitutional right to due process, and that the state court erred by finding that this shackling did not prejudice him because he was only shackled for the first day of a two-week voir dire. The district court held that the Washington Supreme Court did not act unreasonably in rejecting this due process claim. We affirm the district court. Assuming, *arguendo*, that Elmore can show a violation of due process, he is not entitled to habeas relief because he cannot show that this violation prejudiced his sentencing. *See Washington v. Recuenco*, 548 U.S. 212, 221 (2006). We assess whether Elmore's shackling "had substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

The prejudice inquiry is relatively fact-specific and applies both to the analysis of the purported due process violation and the ineffective assistance of counsel claim discussed *infra*. "To determine whether the imposition of physical restraints constitutes prejudicial error, we have considered the appearance and visibility of the restraining device, the nature of the crime with which the defendant was charged and the strength of the state's evidence against the defendant." *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008); *Duckett v. Godinez*, 67 F.3d 734, 747–49 (9th Cir. 1995) (visibility of restraints). We have suggested that the amount of time a prisoner is shackled before the jury is also important. *Larson*, 515 F.3d at 1064 (finding no prejudice where defendant was "wearing the leg brace for the first two days of his six-day trial"); *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989) ("[T]he greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice."). When shackling occurs in the penalty phase, we have also considered whether the shackling presents an image that a defendant is too dangerous to be unrestrained. *Cox v. Ayers*, 613 F.3d 883, 892 (9th Cir. 2010).

We hold that Elmore cannot show prejudice from his shackling on the first day of voir dire because of the limited duration of his shackling and the violent nature of his crime. Elmore correctly argues that the shackling was visible: he wore a belly chain and leg irons. Elmore also notes that the shackling could have influenced the first impression jurors had of him. However, this was partly the point of the defense strategy: Elmore's defense attorney had decided to attempt to show Elmore's acceptance of responsibility. Elmore had

agreed to appear before the jury in jail clothing for the entire trial as part of this strategy.

The specific facts of the crime, which were gruesome and violent, also suggest that Elmore was not prejudiced, although this should be considered in light of the fact that capital murder trials always consider extremely violent crimes. *Larson*, 515 F.3d at 1063 (no prejudice where shackling occurred during trial for a violent retaliation murder against family members).

The duration of Elmore's shackling also suggests that there was no prejudice. Unlike our holding in *Spain*, where the defendant's shackles were conspicuous for the entire trial, Elmore was shackled for one day. *Spain*, 883 F.2d at 722. Two weeks passed during the jury selection process. The jurors who ultimately issued the verdict saw Elmore without restraints for a week after selection. Thus, for almost three full weeks, Elmore did not appear in shackles before the jury that issued the death sentence.

## II. Ineffective Assistance of Counsel Claims

Elmore raises four related ineffective assistance of counsel claims: (1) the defense attorney failed to object to the use of restraints at trial, (2) the defense attorney did not present mitigation evidence concerning mental health, lack of future dangerousness, abuse Elmore allegedly experienced in prison and remorse, (3) the defense attorney did not object to the redaction of the taped confession to exclude material that showed aspects of Elmore's contrition, and (4) the defense attorney incorrectly advised him that pleading guilty increases the chance of a life sentence.

To prove that he was deprived of his Sixth Amendment right to the effective assistance of counsel, Elmore must satisfy a two-part standard. First, he must show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). We "begin with the premise that 'under the circumstances, the challenged action[] might be considered sound trial strategy.'" *Cullen v. Pinholster*, 131 S.Ct. 1388, 1404 (2011) (quoting *Strickland*, 466 U.S. at 689). We "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Pinholster*, 131 S. Ct. at 1407. Second, Elmore must show that Komorowski's alleged deficient performance prejudiced the defense. To meet this standard, Elmore must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "In the context of a plea, a petitioner satisfies the prejudice prong of the *Strickland* test where 'there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'" *Smith v. Mahoney*, 611 F.3d 978, 986 (9th Cir. 2010) (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

Under AEDPA, Elmore must also show that the Washington state court adjudication was objectively unreasonable in dismissing his ineffective assistance of counsel claims. *See Brown v. Uttecht*, 530 F.3d 1031, 1033 (9th Cir. 2008). Our review is therefore "doubly deferential," because we must "take a highly deferential look at counsel's performance through the deferential lens of [AEDPA]." *Pinholster*, 131 S. Ct. at 1403 (citations and internal quotation marks omitted).

## A.  Failure to Object to Restraints

The Washington Supreme Court concluded that counsel was deficient in not objecting to the use of restraints but that Elmore was not prejudiced by his wearing of restraints. *In re Elmore*, 172 P.3d at 347. Elmore challenges the conclusion that he was not prejudiced.

Elmore's case does not fit into any of the circumstances of deficient performance where we assume prejudice, namely: (1) a denial of counsel, (2) state interference with counsel's assistance, or (3) an actual conflict of interest. *See Walker v. Martel*, 709 F.3d 925, 941 (9th Cir. 2013) (citing *Smith v. Robbins*, 528 U.S. 259, 287 (2000)). Instead, we conduct the prejudice inquiry by considering many of the same factual issues we did in Section I, *supra*. *See Walker*, 709 F.3d at 942 ("We may look to the due process shackling cases as illustrative of the degree of prejudice assigned to different restraints."). The central question is whether counsel's failure to object to Elmore's one-day appearance in shackles created a reasonable probability of a different outcome at the sentencing trial.

As above, we conclude that the Washington Supreme Court was not unreasonable in concluding that Elmore failed to show prejudice from his shackling because of the limited duration of the shackling and the violent nature of the crime. The Washington Supreme Court applied this prejudice standard to the ineffective assistance of counsel claims and arrived at the same conclusion. *In re Elmore*, 172 P.3d at 352. We hold that its analysis was reasonable.

### B. Presentation of Mental Health and Brain Damage Evidence

Elmore next argues that his defense counsel was required to fully explore defenses based on mental health and possible brain damage, including retaining a neuropsychological expert, before deciding not to present each of these defenses. Elmore also argues that his defense attorney did not expand on sympathetic information from his background, such as his family, his time in the military during the Vietnam war, his exposure to neurotoxins that may have led to brain damage, his friendships, his low risk of future violence given his behavior in jail, and his relationship with Sue Ohnstad.

As a threshold matter, we distinguish two separate but complementary defense strategies that were available to Komorowski at the time of Elmore's sentencing. The first, the mental health defense, refers to the presentation of mitigating factors related to Elmore's possible mental disorders, "child sexual and physical abuse, adult sexual trauma, and neuropsychological impairment." The second, the brain damage defense, refers to mitigating factors related to Elmore's physical brain damage from prior head injuries and an alleged lifelong exposure to toxic agents, including during Elmore's service as a soldier in Vietnam. The Washington Supreme Court decision dismissing Elmore's personal restraint petition, at times, conflated the mental health and brain damage defenses. *See In re Elmore*, 172 P.3d at 341 ("According to Dr. Kleinknecht, if there were clinically significant brain damage, he would have expected it to manifest through difficulty in abstract thinking, poor memory, inability to use higher mental processes, and inability to hold objects."); *id.* at 342 ("Dr. Roesch testified that his evaluation failed to reveal any evidence of organic

brain damage, although that was not the focus of his evaluation.").

We conclude that defense counsel was not deficient in focusing on a remorse-oriented strategy, rather than presenting evidence related to Elmore's mental health or brain damage. Even if we entertain the possibility that Elmore might be correct that some of the material Komorowski did not present to the jury could have assisted his case, his arguments are little more than a challenge to his defense attorney's trial strategy with the benefit of hindsight. As long as defense counsel uses a "sound trial strategy," employing that strategy does not constitute deficient performance. *Brown*, 530 F.3d at 1035. "[C]ounsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). "Once counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses." *Rios v. Rocha*, 299 F.3d 796, 807 (9th Cir. 2002).

Having retained a trial consulting firm that conducted two mock trials, Komorowski and his defense team made a reasonable strategic decision to pursue a remorse defense. These mock trials showed that jurors responded better to evidence about Elmore's remorse and acceptance of responsibility than to mitigation evidence concerning his mental health or brain damage. Komorowski thus focused his attention on having three judges, who had overseen phases of Elmore's charging and sentencing, testify about Elmore's remorse and willingness to accept responsibility by pleading guilty. He also called the defense investigator to present the

jury with Elmore's background information, such as his family history and service in Vietnam.

Considering what they perceived to be the relative strength of a remorse defense, Komorowski and the defense team made the strategic decision to pursue this defense exclusively. Komorowski did hire two mental health experts to evaluate Elmore. Based on the findings of the mental health experts, Komorowski was concerned that a strategy that presented other defenses to complement the remorse defense would detract from, or destroy, the remorse strategy. For example, in response to a mental health defense, the prosecution's expert could have potentially introduced evidence of Elmore's past sexual abuse of Kristy Ohnstad and other acts of sexual molestation that Komorowski believed would have led to a death penalty. In particular, through researching some of Elmore's mental health issues, defense counsel had discovered that Elmore had engaged in inappropriate sexual activity with other girls. Komorowski also was concerned about opening the door for the prosecution to present the details of the crime to the jury.

Ultimately, the decision to present a limited defense to restrict the prosecution's rebuttal evidence was a legitimate strategy. *See Bell v. Cone*, 535 U.S. 685, 700 (2002). Based on the research of the defense team, Komorowski believed at the time that a "mitigation package on remorse and acceptance of responsibility" would prevent the prosecution from presenting damaging rebuttal evidence. It was not deficient performance for Komorowski to elect this strategy. The decisions not to present mitigation evidence related to mental health or brain damage were even more reasonable in light of the defense team's fears that Elmore would not cooperate with the remorse strategy if they waited any longer.

Komorowski testified that he felt as though he was "running out of time." Elmore had received a letter from Sue Ohnstad in which she said that she would no longer have contact with him. After receiving this letter, Elmore told the defense investigator that he no longer had anyone to whom he thought he needed to apologize. Komorowski also testified that Elmore had begun implying to the jail staff that he was reconsidering his feelings of remorse. Given the concern that Elmore would not cooperate at sentencing, it was not deficient performance for Komorowski to proceed with the remorse strategy to the exclusion of the mental health and brain damage defenses. We hold that it was not unreasonable for the Washington Supreme Court to dismiss these ineffective assistance of counsel claims.

## C. Redacted Taped Confession

Elmore next claims that his defense counsel was ineffective for not objecting to the redaction of his taped confession during the sentencing trial. This redaction removed material in which Elmore had expressed regret about his relationship with Kristy Ohnstad.

Although it might have been deficient performance for defense counsel to completely ignore this omission, Komorowski did ask about this material on cross-examination. One of the detectives assigned to Elmore's case read verbatim Elmore's statement to the jury. The jury still heard Elmore's statements about his relationship with Kristy Ohnstad.

The inclusion of this statement in cross-examination also makes it far less likely that the omission of this tape evidence prejudiced the defense. The jury still heard Elmore's

statements about his relationship with Kristy Ohnstad. Although a third party reading in testimony is arguably weaker than the jury's hearing Elmore's own voice, the manner in which the evidence was presented can cut both ways. Elmore's defense counsel isolated Elmore's statement from the other parts of the confession, where Elmore described the gruesome nature of the crime. In these circumstances, it was not unreasonable for the Washington Supreme Court to conclude that Elmore was not deprived of his Sixth Amendment rights.

### D. Advice to Plead Guilty

Elmore contends that his defense counsel incorrectly advised him to plead guilty because "he would have a better chance of avoiding the death penalty than if he went to trial." Elmore also points out that defense counsel did not tell him that by pleading guilty, the prosecution could still introduce all the facts of the crime to the jury at sentencing.

The decision to plead guilty in a capital case is a serious one, and counsel has a professional duty to explain to a defendant the advantages and disadvantages of entering the guilty plea. *See* American Bar Association, *Death Penalty Guidelines* 10.9.2 (2003). However, a defendant still retains the right to plead guilty to a capital crime. In the past, we have held that a defendant may want to plead guilty for a number of reasons, including sparing a defendant's family from public scrutiny, minimizing trauma to victims and survivors, and a desire to accept responsibility. *See Deere v. Cullen*, 718 F.3d 1124, 1146 (9th Cir. 2013).

Assuming, *arguendo*, that Komorowski performed deficiently by advising Elmore to plead guilty, Elmore cannot

show that this advice prejudiced him under the second prong of *Strickland*. Elmore would have to show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. Although Elmore submitted an affidavit to this effect, the record demonstrates otherwise. Elmore already attempted to plead guilty at his first court appearance. At all times thereafter, he expressed a desire to take responsibility for his actions. He also wanted to enter a guilty plea to spare his family from the publicity associated with a trial.

We have also held that a defendant does not establish prejudice from a guilty plea, where, as here, there is no doubt about the guilt of a defendant. *See Smith*, 611 F.3d at 989–90. "[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial." *Hill*, 474 U.S. at 59. "[T]hese predictions of the outcome at a possible trial, where necessary, should be made objectively, without regard for the idiosyncrasies of the particular decisionmaker." *Id*. at 59–60 (internal quotation marks omitted). Given the evidence against Elmore, including the damning tape-recorded confession, it is highly likely that a jury would have still convicted him of the same crime, even if he had not pleaded guilty. Although Elmore suggests that his attorney could have presented a mental health defense at the guilt phase of a trial, Elmore has not demonstrated prejudice because reports from the mental health experts did not establish a reasonable probability that the defense would have succeeded. *See* Section III.C, *supra*. Had Elmore been convicted at the guilt phase, he would have been in the same

position during the penalty phase of the trial, except that a remorse defense may have been weakened.

## III.    Impartial Jury

Elmore also claims that he was deprived of his right to trial by an impartial jury because a juror lied during voir dire. Juror 12 stated that he had not been the victim of sexual abuse. Five years after the trial, the juror revealed in an interview that he had been the victim of two acts of sexual molestation as a child. The Washington Supreme Court rejected Elmore's claim, concluding that the juror's sexual abuse was not material to Elmore's trial because the incidents of molestation were "minor and occurred when the juror was a young teen. Neither incident involved violence or rape, the crimes for which petitioner was prosecuted." *In re Elmore*, 172 P.3d at 351.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). This requires that a "juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id*. at 723. To show that Juror 12's purported lies deprived Elmore of the right to a fair trial, Elmore must demonstrate that Juror 12 failed to honestly answer a material question on voir dire. Elmore must then show that a correct response would have provided a basis for a challenge for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). If Elmore is able to show juror bias and lack of a fair trial, then the appropriate remedy is a hearing on juror bias. *Smith v. Phillips*, 455 U.S. 209, 215 (1982).

Even if the responses by Juror 12 were material, Juror 12 likely could not have been removed for cause. The juror stated in his questionnaire that he could listen to the evidence and decide the case with an open mind, that he would be fair to both sides, and that he would vote to impose the death penalty on a case-by-case basis. Elmore argues that Juror 12's alleged lies on other questions regarding sexual crimes invalidate this questionnaire. However, the juror stated that he did not consider the acts of molestation to be crimes or sexual offenses. This suggests that he believed his responses on the questionnaire to be accurate. Accordingly, we conclude that the Washington Supreme Court was not unreasonable in dismissing Elmore's claims alleging juror bias.

## IV.    Conclusion

We hold that the Washington Supreme Court's resolution of Elmore's constitutional claims was not unreasonable. The district court did not err in denying Clark Elmore's challenges to his conviction and death sentence, and we therefore affirm the district court's decision.

All outstanding motions are denied.

Each party shall bear its own costs on appeal.

**AFFIRMED.**

HURWITZ, Circuit Judge, concurring in part and concurring in the result:

Clark Elmore committed a truly monstrous crime. A state that has chosen to impose the death penalty can surely reserve it for such an offense.

But, before the state can impose that sentence, Elmore is entitled under the Sixth Amendment to effective assistance of counsel. I doubt that he received competent representation. His lawyer, who had never before handled a capital case, advised Elmore to plead guilty without receiving any agreement as to sentence in return.[1] The lawyer allowed Elmore to appear in shackles at his first appearance before the sentencing jury. The one-hour mitigation presentation consisted entirely of unconvincing attempts to prove through court personnel that Elmore was remorseful. And, counsel never investigated whether this senseless crime was at least in part the product of Elmore's organic brain damage.

But under AEDPA, my serious doubt as to whether the Sixth Amendment was honored is not enough. Rather, we cannot afford relief if "fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted); *Clark v. Arnold*, 769 F.3d 711, 724 (9th Cir. 2014).

---

[1] "[P]leading guilty without a guarantee that the prosecution will recommend a life sentence holds little if any benefit for the defendant." *Florida v. Nixon*, 543 U.S. 175, 191 n.6 (2004); *see also* Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 331–32 (1983) (explaining the benefit of conducting a guilt phase trial in capital cases even "where overwhelming evidence of guilt exists," and noting compatibility of this approach with a penalty phase remorse defense).

Applying that forgiving standard, I concur in the panel opinion insofar as it concludes that the Washington Supreme Court did not unreasonably determine that Elmore failed to establish constitutional prejudice from either the guilty plea or the shackling. And, although defense counsel plainly fell below the applicable standard of care in not investigating Elmore's brain damage, I cannot conclude that the state court unreasonably determined that there is no reasonable probability that a proper investigation would have changed the outcome. Thus, I agree that the death penalty must stand.

## I.

The majority holds that the Washington Supreme Court reasonably rejected Elmore's ineffective assistance of counsel claim relating to brain damage because the decision to present a limited mitigation case was a "legitimate strategy." But we evaluate strategy "in terms of the adequacy of the investigations supporting" it. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *see also Mann v. Ryan*, 774 F.3d 1203, 1217–18 (9th Cir. 2014). Elmore's lawyer conducted *no* brain damage investigation, and candidly admitted that he failed to do so because of inexperience, not strategy.

The Supreme Court has emphasized that in preparing a death penalty mitigation defense, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland v. Washington*, 466 U.S. 668, 691 (1984)); *see also Mann*, 774 F.3d at 1216 ("[C]ounsel has an obligation at the penalty phase to conduct a thorough investigation of the defendant's background." (internal quotation marks omitted)). This duty exists wholly apart from the strategic decision about what evidence to

present in the mitigation case.  *See Wiggins*, 539 U.S. at 521–23.  The adequacy of counsel's investigation is determined by "prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Id.* at 523 (quoting *Strickland*, 466 U.S. at 688–89) (citation and internal quotation marks omitted).

The prevailing professional norms in 1995 plainly required an investigation into brain damage.  The American Bar Association Guidelines have been repeatedly cited by the Supreme Court as "'guides to determining what is reasonable'" in capital litigation defense. *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688).  The Guidelines require death penalty counsel to investigate "all reasonably available mitigating evidence," including specifically whether the client had suffered any mental injuries or has cognitive limitations.  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1 (1989).  Consistent with the Guidelines, several death penalty experts submitted declarations stating that reasonable death penalty counsel would have investigated the possibility that Elmore had brain damage.  Those declarations were uncontroverted, and for good reason; we and our sister Circuits have repeatedly treated brain damage as a central consideration in death penalty mitigation defense. *See, e.g.*, *Mann*, 774 F.3d at 1217–18; *Littlejohn v. Trammell*, 704 F.3d 817, 860 (10th Cir. 2013); *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006); *Jacobs v. Horn*, 395 F.3d 92, 102–03, 107 (3d Cir. 2005).

The evidence in this case plainly "would have led a reasonably competent attorney to investigate further" about brain damage.  *Wiggins*, 539 U.S. at 534.  Elmore's

background was replete with toxin exposure—he grew up near an airport used for crop dusting, was exposed to Agent Orange while serving in Vietnam, and had extensive contact with toxic materials while working on oil pipelines and with automobiles. Counsel was also aware that Elmore had suffered various head injuries, including a blow to the head from an ax. Both mental health experts who examined Elmore testified that they would have recommended neurological testing had they been apprised of Elmore's history. And, a death penalty expert who consulted with counsel specifically recommended brain damage testing. Yet defense counsel did nothing. "[A]ny reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses . . . ." *Id.* at 525; *see also Mann*, 774 F.3d at 1217 ("'When tantalizing indications in the record suggest that certain mitigating evidence may be available, those leads must be pursued.'" (quoting *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007)) (alteration omitted)).

Counsel not only failed to undertake any brain damage investigation, but offered no explanation for this omission other than inexperience.[2] That admission, although admirably forthright, cannot justify forgoing investigation. *See Wiggins*, 539 U.S. at 526 (finding ineffective assistance in part because counsel's "failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *Williams v.*

---

[2] Counsel had never represented a death penalty defendant prior to Elmore, and he had never retained a neuropsychologist or neurologist in his previous criminal defense work. He testified that "unless identification of signs or symptoms of traumatic brain injury were covered" in one of the death penalty seminars that he attended, "he did not recall ever having received such training."

*Taylor*, 529 U.S. 362, 395 (2000) (finding ineffective assistance in part because the failure to investigate was "not because of any strategic calculation but because [counsel] incorrectly thought that state law barred access to [relevant] records").

The state court's conclusion that counsel's representation met prevailing norms was thus flatly inconsistent with clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1) (allowing habeas relief if a state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"). And, the majority's conclusion that counsel's oversight can be excused as "strategy" is in direct tension with our recent decision in *Mann*. In that case, we squarely held that the state court unreasonably determined that counsel's failure to investigate brain damage did not fall below an objective standard of reasonableness:

> [C]ounsel could not have made a reasoned strategic decision to not present mitigating evidence regarding Mann's organic brain damage or other life history because he did not even attempt to explore that evidence. Rather, the record suggests that his failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment.

774 F.3d at 1218 (alterations and internal quotation marks omitted). No different conclusion can be reached here.

Although "strategic choices made after thorough investigation of law and facts . . . are virtually unchallengeable," *Strickland*, 466 U.S. at 690, "strategy" is

not a talisman that insulates ineffective representation from constitutional norms, *see Wiggins*, 539 U.S. at 521, 533–34 (rejecting counsel's argument that their "strategic" conduct was effective assistance because their investigation did not "reflect reasonable professional judgment"). "An uninformed strategy is not a reasoned strategy. . . . It is, in fact, no strategy at all." *Mann*, 774 F.3d at 1218 (quoting *Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008)) (internal quotation marks omitted).

Counsel's failure to investigate brain damage was plainly not effective representation. A state that chooses to impose capital punishment owes a defendant more. Even when scrutinized with AEDPA deference, the state court's determination to the contrary was unreasonable.

## II.

But, even when counsel's performance falls below the applicable standard of care, a successful ineffective assistance claim also requires proof of prejudice. *See Strickland*, 466 U.S. at 687. "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). And, under AEDPA, I am required to review with deference the state court's decision that Elmore was not prejudiced by the failure to present brain damage

evidence at the penalty trial.[3]  I am unable to conclude that
the state court unreasonably determined on the record before
it that there was no prejudice.

In the state post-conviction review proceedings, both
Elmore and the State submitted evidence about brain damage.
In reviewing this evidence, the Washington Supreme Court
stated that the "expert witnesses did not agree on whether, or
to what extent, Elmore's mental deficiencies affected his
ability to conform to lawful behavior." *In re Elmore*,
172 P.3d 335, 347 (Wash. 2007) (en banc).    This
characterization of the evidence was accurate.  Elmore's
experts testified that he suffered from some form of brain
damage, and that this brain damage could have influenced his
decision-making during the murder.   These experts also
concluded, however, that Elmore's brain damage did not
prohibit him from functioning in society.   Indeed, one
neuropsychologist stated: "Mr. Elmore was able to tell right
from wrong at the time of the crime.  He knew the nature and
quality of his act.  He was not insane."

---

[3] As the panel notes, the Washington Supreme Court appeared to
conflate the mental health and brain damage issues.  It is also unclear
whether the Washington Supreme Court expressly reached the *Strickland*
prejudice prong with respect to the brain damage investigation.  We must,
however, apply AEDPA deference unless it is clear that "the state court
has not decided an issue." *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th
Cir. 2006); *see also Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per
curiam) (noting that AEDPA's deferential standard of review requires that
state court opinions "be given the benefit of the doubt").  I therefore must
assume that the state court found that there was no constitutional prejudice
from the failure to introduce brain damage evidence, and review that
finding deferentially under AEDPA.

The State's expert, although agreeing that Elmore likely suffered from brain damage, flatly testified that any neurological impairments did not contribute to the crime. He explained that "there was a great deal of evidence right around and at the time of the crime that indicated that Mr. Elmore was calm, calculating, able to conform his conduct with requirements for the law, and that he took rather significant measures prior to the crime and during the crime to cover it up."

To be sure, because no "causal nexus" is required between the defendant's proffered mitigation and the crime, *see Hurles v. Ryan*, 752 F.3d 768, 784–85 (9th Cir.), *cert. denied*, 135 S. Ct. 710 (2014), this brain damage evidence would have been admissible during the sentencing trial had counsel pursued a competent investigation. But, given the absence of a causal nexus, the equivocal nature of the evidence, the State's contrary expert, the horrific nature of the crime, Elmore's attempts to cover it up, and the uncontested evidence that he functioned well on the job and in society in general, I cannot find unreasonable the state court's conclusion that Elmore failed to establish a reasonable probability that the outcome would have been different had counsel performed competently.[4] Because constitutional ineffective assistance requires both performance below professional norms and a reasonable probability of prejudice, I concur in the denial of the ineffective assistance of counsel claim as to brain damage.

---

[4] Although counsel was also ineffective in failing to properly investigate evidence that Elmore was repeatedly raped while in prison, *see Doe v. Ayers*, 782 F.3d 425, 450–55 (9th Cir. 2015), I am similarly unable to conclude that the Washington Supreme Court was unreasonable in denying relief.