# SUPREME COURT OF THE UNITED STATES

## CLARK ELMORE *v.* DONALD R. HOLBROOK, SUPERINTENDENT, WASHINGTON STATE PENITENTIARY

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 15–7848.   Decided October 17, 2016

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE GINSBURG joins, dissenting from the denial of certiorari.

Petitioner Clark Elmore was convicted of murder in 1995 and was sentenced to death. His court-appointed lawyer, who had never tried a capital case before, knew that Elmore had been exposed to toxins as a young adult and that he had a history of impulsive behavior. A more experienced attorney encouraged Elmore's lawyer to investigate whether Elmore had suffered brain damage as a young man. Instead of doing so—indeed, instead of conducting any meaningful investigation into Elmore's life—Elmore's lawyer chose to present a one-hour penalty-phase argument to the jury about the remorse that Elmore felt for his crime. As a result, the jury did not hear that Elmore had spent his childhood playing in pesticide-contaminated fields and had spent his service in the Vietnam War repairing Agent Orange pumps. The jury did not hear the testimony of experts who concluded that Elmore was cognitively impaired and unable to control his impulses. The jury heard only from an assortment of local judges that Elmore had looked "dejected" as he pleaded guilty to murder, not from the many independent witnesses who had observed Elmore's searing remorse.

The Constitution demands more. The penalty phase of a capital trial is "a constitutionally indispensable part of the

process of inflicting the penalty of death." *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976). It ensures that a capital sentencing is "humane and sensible to the uniqueness of the individual." *Eddings* v. *Oklahoma*, 455 U. S. 104, 110 (1982). Elmore's penalty phase fell well below the bare minimum guaranteed by the Constitution. His lawyer acted deficiently in choosing a mitigation strategy without fully exploring the alternatives and in failing to investigate the mitigation strategy that he did choose to present. And had the jury known that Elmore—who had never before been convicted of a crime of violence and felt searing remorse for the heinous act he committed—might be brain damaged, it might have sentenced him to life rather than death.

This Court has not hesitated to summarily reverse in capital cases tainted by egregious constitutional error, particularly where an attorney has rendered constitutionally deficient performance. See, *e.g., Hinton* v. *Alabama*, 571 U. S. ___ (2014) (*per curiam*); *Sears* v. *Upton*, 561 U. S. 945 (2010) (*per curiam*); *Porter* v. *McCollum*, 558 U. S. 30 (2009) (*per curiam*). This case plainly meets that standard. For that reason, I respectfully dissent from the denial of certiorari.

## I
### A

Elmore was born in 1951 in central Oregon, where he lived until his teens. Social History, 12 Record 5524–5530. He was exposed to powerful neurotoxins from a young age. Elmore's house in Oregon was located next to an airport from which crop dusters regularly sprayed pesticides. Trial Court Findings of Fact, No. 95–1–00310–1 (Sup. Ct. Whatcom Cty., Wash., Sept. 10, 2004), 14 *id.*, at 6519–6520 (FOF). Decades after Elmore moved away, the state environmental agency took soil samples that showed toxin levels over 4,500 times the maximum amounts allowed by

state law. Decl. of Raymond Singer, 11 *id.*, at 5394 (Singer Decl.). Later, Elmore worked on cars and oil pipelines where he regularly melted lead batteries and handled solvents without gloves. FOF, 14 *id.*, at 6521–6522. And when Elmore left home at age 17 to serve in the Vietnam War, he was tasked with repairing Agent Orange pumps without protective equipment. *Id.,* at 6522; Singer Decl., 11 *id.,* at 5395.

Experts who testified at Elmore's postconviction hearing agreed that this exposure placed him at serious risk of brain damage. They conducted neuropsychological tests that revealed mild to moderate cognitive impairments, see Reporter's Tr. in No. 95–1–00310–1, 15 *id.*, at 7076 (PRP Tr.), including a marked inability to control his emotions and impulses, see *id.,* at 7079–7080. Elmore tested in the bottom one percent on tests measuring that characteristic. *Id.*, at 7080. The experts concluded that damage to Elmore's frontal lobe had made him impulsive and suscep- tible to emotion. See Decl. of Dale Watson, 11 *id.*, at 5383; Decl. of Raymond Singer, 13 *id.*, at 6389 (2d Singer Decl.); Decl. of George Woods, 11 *id.*, at 5360–5361 (Woods Decl.). And they agreed that the murder Elmore later committed was linked to Elmore's cognitive deficits—for instance, by making him unable to "pu[t] on the brakes" when emo- tional. See FOF, 14 *id.,* at 6495; see also Woods Decl., 11 *id.,* at 5358; 2d Singer Decl., 13 *id.,* at 6389–6390; PRP Tr., 15 *id.*, at 7094.

Elmore was discharged from the Army under honorable conditions in 1972, but found it hard to return to civilian life. 12 *id.,* at 5631. He moved around the United States, taking jobs in hotels, gas stations, farms, and oil fields. Social History, *id.,* at 5532–5538. Elmore was arrested three times—once for stealing checks, once for stealing furniture, and once for stealing appliances from a motel. Reporter's Tr. in No. 95–1–00310–1, 5 *id.,* at 2470–2473 (Trial Tr.); Social History, 12 *id.,* at 5532, 5536. Officers

at one prison reported that Elmore was nonviolent and, if anything, was the victim of other inmates' threats. *Id.,* at 5533–5534. After his second conviction, Elmore was incarcerated for two years in Washington state prison, where he was repeatedly raped by another inmate. *Id.,* at 5536. Until the murder for which he was ultimately sentenced to death, and despite his emotional challenges, Elmore was never convicted of a violent crime.

Elmore's death sentence arises out of a murder that he committed in 1995. The crime was horrific. Elmore raped and murdered his stepdaughter, first strangling her with a belt, then driving a sharp object through her ear, and finally bludgeoning her with a hammer. *In re Elmore*, 162 Wash. 2d 236, 244, 172 P. 3d 335, 340 (2007). Elmore was apparently motivated by fear that the victim would tell the authorities that he had previously sexually abused her. *Ibid.* After several days of misdirecting the authorities, Elmore turned himself in and confessed. FOF, 14 Record*,* at 6460. In the wake of the murder, Elmore expressed extreme remorse. A jailhouse minister who visited Elmore in prison later attested that, the day after he arrived, he "was huddled into a ball at the back of the room, shaking uncontrollably." Decl. of Dana Paul Sellars, 11 *id.*, at 5399 (Sellars Decl.). Elmore, he said, "was unlike any prisoner I had counseled before. He was wracked with anguish and dripping with remorse." *Id.,* at 5400. A correctional officer at the prison later testified that Elmore appeared "in a state of disbelief about what he had done" and was "an emotional wreck." Decl. of Donald Pierce, *id.*, at 5404–5405.

## B

The jury that sentenced Elmore to death learned about the terrible crime he committed, but heard virtually nothing about his troubling background and cognitive defects. A lawyer named Jon Komorowski was appointed to repre-

sent Elmore at trial. Komorowski had never previously worked on a capital case. Decl. of Jon Komorowski, 11 *id.,* at 5325 (Komorowski Decl.). On Komorowski's advice, Elmore pleaded guilty to capital murder without any negotiations with the prosecution. *Id.,* at 5326. Because Elmore pleaded guilty, the trial consisted of only a penalty phase. During that penalty phase, the State presented nine witnesses, all of whom testified regarding the horrific circumstances of the crime. Trial Tr., 5 *id.*, at 2348–2580. The State also presented evidence of Elmore's three criminal convictions, all two decades old. *Id.,* at 2470–2473.

Komorowski's mitigation case for Elmore lasted only an hour. See 162 Wash. 2d, at 250, 172 P. 3d, at 343. The theme was remorse: "[T]here are no excuses in this case and none are offered. There is acceptance of responsibility and punishment." Trial Tr., 5 Record 2367; see also *id.,* at 2580–2658 (defense case). The only character witnesses were the three judges who had presided over Elmore's pretrial appearances, who testified that he had sought to plead guilty from the outset. *Id.*, at 2581–2582, 2587–2588, 2590–2592. One described Elmore as "somewhat upset" and "overwhelmed," a second as "dejected." *Id.*, at 2586, 2592. The defense investigator read out a "bare bones" summary of Elmore's biography. *Id.*, at 2306, 2599–2601. Finally, an expert witness testified that Elmore's prior convictions were not violent felonies under Washington's three-strikes law. *Id.*, at 2644–2658.

Years later, in postconviction proceedings, Komorowski acknowledged his error, explaining that the decision not to investigate Elmore's medical history was "the product of . . . inexperience" and "not a strategic decision." Komorowski Decl., 11 *id.,* at 5329. He admitted that he and the defense team had reviewed Elmore's prison records and some of his hospital records, and had spoken to Elmore's family, who had told them about Elmore's hardships as a child and as a young adult. PRP Tr., 15 *id.*, at 6907–6911.

And he consulted with more experienced counsel, including an attorney named Todd Maybrown, who strongly advised Komorowski to investigate indicia of "organic brain disorder" and cautioned that the testimony of a psychologist with no neurology background would not be sufficient. Decl. of Todd Maybrown, 12 *id.*, at 5540–5541 (Maybrown Decl.). Maybrown advised Komorowski that "he might need to hire a medical doctor to try to determine if his client suffered from brain damage." *Id.*, at 5541–5542.

But Komorowski did not hire a neuropsychiatrist, nor did he conduct any further investigation into the possibility of brain damage. Komorowski consulted with three mental health professionals, but none of them tested for any sort of brain damage. PRP Tr., 15 *id.*, at 6985–6986, 7406–7407. The first administered a personality test and concluded that Elmore was not insane, but recommended that Komorowski consult a second expert about whether Elmore was a psychopath. *Id.*, at 7404–7405, 7412. The second concluded that Elmore was not a psychopath: He demonstrated remorse and empathy, and his crime was impulsive and reactive, indicating heightened emotional arousal rather than psychopathy. *Id.*, at 7230–7231. The third was not a licensed psychologist at all. *Id.*, at 6889, 6911, 6924. The two psychologists later agreed that, had Komorowski told them about Elmore's exposure to toxins, they would have recommended neuropsychological testing. *Id.,* at 7422–7423, 7243–7244.

## C

Elmore moved for postconviction relief in state court, arguing that Komorowski's representation deprived him of effective assistance of counsel in violation of the Sixth Amendment. But the Washington Supreme Court denied his claim. *In re Elmore*, 162 Wash. 2d 236, 172 P. 3d 335. "There is no question that the defense team did investi-

gate petitioner's mental health deficiencies," the state court held. *Id.,* at 258, 172 P. 3d, at 347. "Rather, the issue is whether counsel's failure to conduct further evaluations amounted to deficient representation. We believe it did not." *Ibid.* The Washington Supreme Court ruled that Komorowski did not perform below the constitutional standard and had instead made a "strategic" decision to curtail the investigation. *Ibid.* According to the state court, Komorowski's strategy was defensible for four reasons: Presenting more mitigation evidence might have opened the door to damaging rebuttal evidence; additional witnesses would have been "cumulative" of the judges who testified; Komorowski worried that if he did not rush to trial, the prosecution might find witnesses who would testify that Elmore's remorse was waning; and Elmore had objected to the presentation of any mitigation case. *Id.,* at 257–258, 263–265, 172 P. 3d, at 346–347, 348–350.

A Federal District Court denied Elmore's habeas petition, and the Ninth Circuit affirmed. *Elmore* v. *Sinclair*, 799 F. 3d 1238 (2015). Two judges held that the Washington Supreme Court's decision was not unreasonable. *Id.,* at 1243. The third would have found that the Washington Supreme Court's determination that Komorowski was constitutionally effective was unreasonable, but concurred because he did not believe that the question of prejudice was beyond debate. *Id.,* at 1256–1257 (opinion of Hurwitz, J.). Elmore petitioned for certiorari.

## II

I would grant the petition and summarily reverse on the ground that Komorowski's performance during the penalty phase of Elmore's trial violated his Sixth Amendment right to effective assistance of counsel.

Under the Antiterrorism and Effective Death Penalty Act of 1996, Elmore is entitled to relief only if the state court's adjudication of his claim "resulted in a decision

that was contrary to, or involved an unreasonable applica-
tion of, clearly established Federal law, as determined by
the Supreme Court of the United States." 28 U. S. C.
§2254(d)(1). In other words, we may not grant relief
where reasonable minds could differ over the correct ap-
plication of legal principles, and we must evaluate that
application on the basis of the law that was "clearly estab-
lished" at the time of the state-court adjudication. See
*Williams* v. *Taylor*, 529 U. S. 362, 402–409 (2000).

The legal principles that govern claims of ineffective
assistance of counsel (IAC) come from *Strickland* v. *Wash-
ington*, 466 U. S. 668 (1984), and were clearly established
over a decade before Elmore's trial. An IAC claim has two
components: A petitioner must show that counsel's per-
formance was deficient and that the deficiency prejudiced
the defense. See *id.,* at 687. To establish deficient repre-
sentation, a petitioner must demonstrate that counsel's
representation "fell below an objective standard of reason-
ableness." *Id.,* at 688. In order to establish prejudice, a
petitioner must show that, but for the constitutionally
deficient representation, there is a "reasonable probabil-
ity" that the outcome of the proceeding would have been
different. *Id.,* at 694.

"A standard of reasonableness applied as if one stood in
counsel's shoes spawns few hard-edged rules." *Rompilla* v.
*Beard*, 545 U. S. 374, 381 (2005). But our cases reveal
clearly established principles that, taken together, demon-
strate that the state court's decision here was contrary to
this Court's precedents and that the state court unreason-
ably applied the *Strickland* standard in evaluating
Elmore's claim.

A

"This is not a case in which defense counsel simply
ignored their obligation to find mitigating evidence."
*Rompilla*, 545 U. S., at 381. But Komorowski's decision

not to search for much of the important mitigating evidence of Elmore's life was objectively unreasonable under *Strickland*. And the Washington Supreme Court's opinion declaring Komorowski's conduct reasonable was contrary to our precedents. Clearly established legal principles make that apparent.

First, it was clearly established that constitutionally effective counsel must thoroughly investigate the defense he chooses to present. In this case, that was the remorse defense, the basket into which Komorowski had put all of Elmore's eggs. See *Wiggins* v. *Smith*, 539 U. S. 510, 526 (2003). Had Elmore's defense team interviewed even the jailhouse minister, for instance, whom they knew was visiting Elmore, the jury would have heard a description of Elmore's remorse that was far more robust than the testimony of judges who had observed Elmore for short periods during his few court appearances. *E.g.,* Sellars Decl., 11 *id.,* at 5400.

The Washington Supreme Court dismissed this testimony as "cumulative," but that conclusion was unreasonable in light of this Court's precedent. *In re Elmore*, 162 Wash. 2d, at 265, 172 P. 3d, at 350. The judges testified that Elmore wanted to plead guilty and commented on his appearance; the jailhouse minister, the correctional officer, and others would have discussed Elmore's actual emotional state over the course of months. Cf. *Williams*, 529 U. S., at 396 (faulting counsel for presenting some character witnesses, but not other, stronger character witnesses, such as certified public accountant); *Wiggins*, 539 U. S., at 518, 526 (faulting counsel where counsel stopped investigation before finding evidence about abusive childhood that was more "detailed" and "graphic" than evidence in counsel's possession).

Second, we have said time and again that while "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchal-

lengeable[,] . . . strategic choices made after less than
complete investigation are only reasonable precisely to the
extent that reasonable professional judgments support the
limitations on investigation." *Strickland*, 466 U. S., at
690–691. Before Komorowski decided to focus exclusively
on a remorse-based defense, he had an obligation to fully
investigate other possible mitigation cases. See *Sears*, 561
U. S., at 953–954; *Wiggins*, 539 U. S., at 521–526. For
example, Komorowski had been specifically told by an
experienced capital attorney that the testimony of a psy-
chologist was unlikely to be sufficient and that the details
of the crime, standing alone, strongly suggested "some sort
of organic brain disorder or dysfunction." Maybrown
Decl., 12 Record 5541. Yet he did not pursue neuro-
psychological testing or investigate Elmore's exposure to
neurotoxins.

The Washington Supreme Court concluded that because
Komorowski had conducted some mental health investiga-
tion, any decision he made about which information to
present to the jury was strategic. *In re Elmore*, 162 Wash.
2d, at 263–264, 172 P. 3d, at 349–350. This was error.
This Court has squarely rejected the notion that "because
counsel had *some* information with respect to petitioner's
background . . . they were in a position to make a tactical
choice." *Wiggins*, 539 U. S., at 527. To the contrary, we
have often emphasized that an attorney who learns *some*
information about a defendant's background is under an
obligation to pursue that information in order to "mak[e]
an informed choice among possible defenses." *Id.,* at 525.
So too here: The information Komorowski did have about
Elmore's background and the advice he received from
Maybrown would have prompted a competent attorney to
conduct further investigation and consult with experts
about brain damage. See Komorowski Decl., 11 Record
5329; Social History, 12 *id.,* at 5526, 5531–5538. While
Komorowski consulted with three experts as to Elmore's

mental health, he neither provided them with sufficient information to make an informed evaluation nor asked any of them to administer tests designed to measure Elmore's brain functioning. PRP Tr., 15 *id.*, at 6985–6986, 7406–7407.

Third, it was clearly established that, while fear of a prosecutor's rebuttal case may justify a decision not to present certain mitigating evidence, it can rarely justify a failure to investigate in the first place. See *Williams*, 529 U. S., at 396 (counsel should have investigated juvenile records even where records contained evidence he had been previously committed to the juvenile system); *Rompilla*, 545 U. S., at 386, n. 5 (counsel should have investigated prior crime even though defense strategy was predicated on keeping evidence of prior crime out). So even if Komorowski's fear of opening the door to damaging rebuttal evidence could have justified a decision not to introduce mitigating evidence, it could not have justified his failure to investigate whether that evidence existed in the first place.

And it is questionable whether Komorowski's fear could even have justified the decision not to introduce the evidence. Komorowski identified three aggravators that he claimed the prosecution could have presented in rebuttal: the gruesome details of the crime, Elmore's sexual abuse of the victim, and his waning remorse. But the first two aggravators were presented to the jury: the details of the crime in the State's penalty-phase argument, Trial Tr., 5 Record 2361–2362, 2500, 2502–2503, and the sexual abuse during the taped confession that was played to the jury, PRP Tr., 15 *id.*, at 6952. Nor was there a strong basis for Komorowski to conclude that Elmore's remorse was waning, as his own defense investigator testified that Elmore remained as remorseful through the day of trial as he had ever been. *Id.*, at 7439–7440.

Finally, it was clearly established that counsel has an

obligation to pursue reasonable inquiries even where a
client is "actively obstructi[ng]" that effort. *Rompilla*, 545
U. S., at 391. Here, evidence introduced at the postconvic-
tion hearing indicated that Elmore resisted some of Ko-
morowski's efforts to develop a mitigation case, telling him
that he would act out in the courtroom if Komorowski put
on testimony about his personal life. PRP Tr., 15 Record
6994–6995. The Washington Supreme Court drew from
this that Elmore "objected to the presentation of a mitiga-
tion case and threatened to act out in the courtroom if
mitigation was put on for the jury." *In re Elmore*, 162
Wash. 2d, at 258, 172 P. 3d, at 347. But Komorowski said
no such thing: He testified only that Elmore objected to
the presentation of details about his personal life, not to
the presentation of any mitigation case at all. PRP Tr., 15
Record 6994–6995. Our precedent makes clear that such
an objection does not justify a wholesale failure to investi-
gate readily available mitigating evidence. *Rompilla*, 545
U. S., at 381.

In short, all of the Washington Supreme Court's justifi-
cations for Komorowski's performance stand in sharp
contrast with principles clearly established by this Court.
No reasonable jurist could conclude that Komorowski's
performance was not deficient.

B

Our precedents make it equally clear that Elmore was
prejudiced by Komorowski's deficient performance.

First, it was clearly established that the key inquiry for
prejudice purposes is the difference between what was
actually presented at trial and what competent counsel
could have presented. See *id.*, at 393. Here, the difference
between the two is stark. At trial, Komorowski presented
no witnesses who knew Elmore personally; the jury none-
theless deliberated for more than a full day. Trial Tr., 5
Record 2733–2734. By contrast, postconviction counsel

put forth a wealth of mitigating information that was available to trial counsel: well-respected community members who could attest to Elmore's remorse; neuropsychological evidence about Elmore's frontal lobe damage and how it may have directly affected the commission of his crime; and information about Elmore's history of head injuries and exposure to neurotoxins, including his exposure to Agent Orange when he served in the Vietnam War.

Second, it was clearly established that an inquiry to prejudice should not presume that an expert opinion about the magnitude and effect of a defendant's mental health issues is rendered meaningless by the State's introduction of a contrary opinion. In *Porter*, for example, the State's two experts disputed petitioner's postconviction expert's conclusion that he was acting under the influence of an extreme emotional disturbance and that brain damage impaired his ability to obey the law. 558 U. S., at 36. We nonetheless concluded that the absence of an expert witness at trial prejudiced petitioner: "While the State's experts identified perceived problems with the tests that [petitioner's expert] used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury." *Id.,* at 43.

Here, too, it was not reasonable to "discount entirely" the testimony of Elmore's three postconviction experts. Particularly given that this was Elmore's first conviction for a violent crime, a jury might have been convinced that this crime was a direct result of Elmore's cognitive impairments, as Elmore's three experts opined. And even if the jury was not convinced that there was a causal nexus between the crime and Elmore's brain damage, there was a reasonable probability that the jury would have at least credited evidence on which all parties—including the State's expert—agreed, namely, that Elmore's cognitive limitations contributed in at least a "longer term" way to

the crime.  PRP Tr., 15 Record 7355; see, *e.g., Williams*,
529 U. S., at 398 (considering evidence of borderline men-
tal retardation even though crime was not linked to cogni-
tive impairments); *Sears*, 561 U. S., at 945 (considering
frontal lobe damage even though crime was not linked to
brain damage).

Finally, it was clearly established that even a defendant
who committed a heinous crime can be prejudiced by
ineffective counsel.  See *Williams*, 529 U. S., at 368 (peti-
tioner "brutally assaulted an elderly woman"); *Rompilla*,
545 U. S., at 397 (KENNEDY, J., dissenting) ("brutal
crime"; victim was stabbed 16 times, beaten with a blunt
object, gashed in the face with beer bottle shards, and set
on fire); *Wiggins*, 539 U. S., at 553, n. 4 (Scalia, J., dissent-
ing) ("bizarre crime" in which 77-year-old woman was
found drowned in her bathtub, missing her underwear,
and sprayed with insecticide).  Elmore's crime was hor-
rific, but there was a dramatic difference between the miti-
gation that was presented and the mitigation that should
have been presented.  The evidence presented by postcon-
viction counsel "adds up to a mitigation case that bears no
relation to the few naked pleas for mercy actually put
before the jury, and although we suppose it is possible that
a jury could have heard it all and still have decided on the
death penalty, that is not the test."  *Rompilla*, 545 U. S.,
at 393.

\*    \*    \*

Many observers, on and off this Court, have questioned
the reliability and fairness of the imposition of capital
punishment in America.  See, *e.g., Glossip* v. *Gross*, 576
U. S. \_\_\_, \_\_\_ (2015) (BREYER, J., dissenting) (slip op., at
1); *Baze* v. *Rees*, 553 U. S. 35, 86 (2008) (Stevens, J., con-
curring in judgment); *Callins* v. *Collins*, 510 U. S. 1141,
1145 (1994) (Blackmun, J., dissenting from denial of certi-
orari); Fletcher, Our Broken Death Penalty, 89 N. Y. U.

L. Rev. 805 (2014); D. Baldus et al., Equal Justice and the Death Penalty: A Legal and Empirical Analysis (1990). Whether our system of capital punishment is inconsistent with the Eighth Amendment, as these critics have charged, is not at issue here. I do believe, however, that whatever flaws do exist in our system can be tolerated only by remaining faithful to our Constitution's procedural safeguards.

All crimes for which defendants are sentenced to death are horrific. See *Glossip*, 576 U. S., at \_\_\_ (BREYER, J., dissenting) (slip op., at 14); *id.,* at \_\_\_ (THOMAS, J., concurring) (slip op., at 6–10). But not all defendants who commit horrific crimes are sentenced to death. Some are spared by juries. The Constitution guarantees that possibility: It requires that a sentencing jury be able to fully and fairly evaluate "the characteristics of the person who committed the crime." *Gregg* v. *Georgia*, 428 U. S. 153, 197 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). That guarantee is a bedrock premise on which our system of capital punishment depends, and it is a guarantee that must be honored—especially for defendants like Elmore, whose lives are marked by extensive mitigating circumstances that might convince a jury to choose life over death. Only upon hearing such facts can a jury fairly make the weighty—and final—decision whether such a person is entitled to mercy.

I respectfully dissent from the denial of certiorari.